UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
C.L. and G.W., individually and on behalf of C.L., a child with
a disability,

                                        Plaintiffs,                                    **OPINION AND ORDER**

                        - against -                                                      No. 10-CV-4315 (CS)

SCARSDALE UNION FREE SCHOOL DISTRICT,

                                        Defendant.
------------------------------------------------------------------------x

<u>Appearances</u>:
Jesse Cole Cutler
Skyer, Castro, Foley & Gersten
New York, New York
*Counsel for Plaintiffs*

Stephanie Lynn Burns
Stephanie Marie Roebuck
Keane & Beane, P.C.
White Plains, New York
*Counsel for Defendant*

<u>Seibel, J.</u>

          Before the Court are Plaintiffs' Motion for Summary Judgment, (Doc. 13), and

Defendant's Cross-Motion for Summary Judgment, (Doc. 16).  Plaintiffs C.L. and G.W. bring

this action, individually and on behalf of their child C.L. ("CL"), pursuant to the Individuals with

Disabilities Education Improvement Act ("IDEIA"), 20 U.S.C. §§ 1401 *et seq.*;[1] Section 504 of

the Rehabilitation Act of 1973, 29 U.S.C. § 794; and Article 89 of the New York State Education

---

[1] The Individuals with Disabilities Education Act ("IDEA") was amended in 2004 by the IDEIA.  All references to
and cases cited herein discussing the IDEA remain authoritative.

Law, N.Y. Educ. Law §§ 4401–4410-b, against Defendant Scarsdale Union Free School District (the "District").  Plaintiffs seek review of an administrative decision by a State Review Officer ("SRO") at the New York State Education Department annulling in part the decision of an Impartial Hearing Officer ("IHO").  The IHO found that (1) the District "failed to classify CL as a student with a disability and eligible for special education provided pursuant to an [Individualized Education Program ("IEP")] under the IDEIA [and] denied the student [a Free and Appropriate Public Education ("FAPE")]"; (2) CL's parents' placement of CL at a private school for the 2008–2009 school year was an "appropriate, if not an ideal placement for CL"; and (3) no equitable considerations militated against tuition reimbursement for Plaintiffs.  (IHO Decision 25, 30, 33.)[2]  The SRO agreed with the IHO's conclusion on the first point (albeit on different grounds); disagreed on the second point, finding that CL's parents had not met their burden of showing that they selected an appropriate private school placement; and did not reach the third point.  (SRO Decision 17, 21, 23.)[3]

Neither party appeals the first finding—that CL should have been classified as a student with a disability and eligible for special education services.  Plaintiffs seek an order reversing the SRO's decision on the second point and awarding Plaintiffs tuition reimbursement for the year 2008–2009.  Plaintiffs also request "compensatory education and monetary relief" for their claim under Section 504 of the Rehabilitation Act.  (Compl. ¶ 40.)[4]  Defendants seek an order affirming the SRO's decision and dismissing Plaintiffs' Complaint.  For the reasons set forth

---

[2] "IHO Decision" refers to the Finding [*sic*] of Fact and Decision of IHO Robert Briglio, Esq., dated December 21, 2009.  (Doc. 1-2.)  Citations to documents that form part of the administrative record relate to hard copy documents that were filed under seal with the Court on October 22, 2010.

[3] "SRO Decision" refers to the Decision of SRO Paul F. Kelly, dated March 10, 2010.  (Doc. 1-3.)

[4] "Compl." refers to Plaintiffs' Complaint, filed May 28, 2010.  (Doc. 1.)

below, the Court denies Plaintiffs' Motion for Summary Judgment and grants Defendant's

Cross-Motion for Summary Judgment dismissing Plaintiffs' complaint.

I.     **Background**

The following facts are undisputed except where noted.

A.     CL's Performance at Greenacres Elementary School

1.     Kindergarten:  2004–2005

CL entered kindergarten at Greenacres Elementary School ("Greenacres") in Scarsdale,

New York in the fall of 2004 and continued to attend Greenacres until he finished third grade in

June 2008.  (Ps' 56.1 ¶ 3;[5] Compl. ¶¶ 7–8.)  Around October 2004, CL began receiving language

and speech services at school to focus on breathing techniques and address disfluency.  (D's 56.1

¶ 9.)[6]  Around January 2005, CL started meeting with a special education teacher in a small

group in the learning resources center ("LRC")[7] for 30 minutes twice per week for pre-reading

instruction.  (*Id.* ¶ 10.)  On March 23, 2005, a committee established pursuant to Section 504 of

the Rehabilitation Act (the "504 Committee") convened to assess CL's performance and need for

occupational therapy services ("OT"); the 504 Committee recommended that CL receive OT

once per week.  (*Id.* ¶ 11; D's Exs. 1–2.)[8]

2.     First Grade:  2005–2006

On October 24, 2005, the 504 Committee met to develop an accommodation plan for CL

for that school year.  (D's Ex. 7.)  The 504 Committee recommended OT twice per week, speech

and language therapy ("SLT") once per week and an LRC class with six students four times per

---

[5] "Ps' 56.1" refers to Plaintiffs' Local Civil Rule 56.1 Statement of Undisputed Material Facts.  (Doc. 15.)
[6] "D's 56.1" refers to Defendant's Statement of Undisputed Facts Pursuant to Local Rule 56.1.  (Doc. 23.)
[7] The LRC is a "building level intervention for students with academic delays which provides either direct or
indirect services with small group instruction.  The LRC is staffed with certified special education teachers who
often have additional certifications."  Defendant's Verified Petition ("D's Pet.") ¶ 5, submitted to the Office of State
Review, Jan. 20, 2010.
[8] "D's Ex." refers to Exhibits 1–42 submitted by the District as part of the administrative record filed under seal.

week.  (*Id.*; D's 56.1 ¶¶ 12–13.)  At the end of the year, CL scored in the seventy-fifth percentile in his LRC assessment, and his report card demonstrated that he made progress in almost every area.  (D's 56.1 ¶ 13; Tr. 257:5–7;[9] D's Ex. 10.)  In his non-LRC academic subjects, CL primarily received grades of two ("understanding is emerging but not consistent") and three ("understands most of the time") on his report card.  (D's Ex. 9.)  Over the course of the year, CL improved in almost every academic category, although he continued to "need improvement" in some of his work habits.  (*Id.*)

        3.     <u>Second Grade:  2006–2007</u>

On October 26, 2006, the 504 Committee reconvened to develop an accommodation plan for CL for the current school year.  (D's 56.1 ¶ 14.)  They recommended a plan similar to that for the previous year—LRC four times per week, OT twice per week, and SLT once per week.  (*Id.*; D's Ex. 11.)  Plaintiffs opted not to have CL participate in SLT and OT through the District and instead provided that therapy privately.  (D's 56.1 ¶ 16.)  Plaintiffs contend that this decision was based on the District's indication that it was unable to provide CL with the appropriate therapy.  (Ps' Reply 56.1 ¶ 16;[10] Tr. 623:19–624:21, 632:25–633:11.)  CL's report card that year reflected a solid mix of grades two ("inconsistent"), three ("good"), and four ("excellent").  (D's Ex. 16.)  The end-of-year comments stated that "CL has successfully completed the second grade curriculum."  (*Id.*)  Although he sometimes needed "reteaching" for new concepts, "[h]e continued to make progress in the academic areas."  (*Id.*)  CL's LRC teacher noted he had made "excellent progress."  (D's 56.1 ¶ 15; Tr. 260:18–20.)

---

[9] "Tr." refers to the transcript of the testimony taken before IHO Robert Briglio on September 24–25, 2009 and October 8–9, 2009 and which constitutes a portion of the sealed administrative record.
[10] "Ps' Reply 56.1" refers to Petitioners' Reply to Defendant's Statement of Undisputed Facts Pursuant to Local Rule 56.1.  (Doc. 19.)

In April and May of 2007, Plaintiffs obtained a psychoeducational evaluation for CL administered by the Soifer Center.  (D's Ex. 13.)  On June 6, 2007, at Plaintiffs' request, the 504 Committee met to review the results of that evaluation.  (*See* D's Exs. 13, 15.)  The results indicated that intellectually, CL "functions within the upper end of the Low Average range," (D's Ex. 13 at 9), and that CL's weakest skills were his "attention, executive functions, and language processing," (*id.*).  The evaluator recommended that Plaintiffs (1) consult with a doctor about CL's attention disorder; (2) confer with the school to obtain services such as an aide and time in the LRC; (3) monitor CL's emotional development; and (4) ensure CL receives "educational therapy," OT, and SLT.  (*Id.* at 11–12; Ex. 17 at 2.)  CL's classroom teacher "verified the findings" from the Soifer Center for the 504 Committee, noting that although CL had made "overall progress" that year, he still faced a number of difficulties—for example, "C.L. often fidgets and requires refocusing"; he "seek[s] additional help from the adults in the room when he is unsure"; and he "frequently requires reteaching of new concepts."  (Ps' 56.1 ¶ 17; D's Ex. 12 at 2.)  Based on this information, the 504 Committee revised CL's program for the following school year by adding various testing accommodations and an aide in CL's classroom for three hours per day to help with CL's attention and executive functioning issues.  (D's 56.1 ¶ 22; D's Ex. 12 at 1.)  Plaintiffs continued to decline OT and SLT services through the District. (D's 56.1 ¶ 24; Ps' Reply 56.1 ¶ 24.)

### 4.    Third Grade:  2007–2008

The 504 Committee reconvened on October 17, 2007 to discuss CL's progress.  At the meeting, the Committee took note of CL's Attention Deficit Disorder diagnosis and his continuing problems with fine motor development and visual coordination.  (D's Ex. 20.)  They decided to continue CL's current plan of LRC four times per week, an aide three hours per day,

OT and SLT (which the parents declined), and various testing accommodations.  (*Id.*)  That year, CL became more resistant to attending LRC.  (D's 56.1 ¶ 29.)  Plaintiffs assert that this resistance stemmed from CL's increasing anxiety about being pulled out of the classroom on a regular basis.  (Ps' Reply 56.1 ¶ 29; D's Ex. 25 at 2; Ps' 56.1 ¶ 38.)

On November 9, 2007, Plaintiffs requested that the District's Committee on Special Education ("CSE") evaluate CL for the purposes of developing an Individualized Education Program ("IEP") for him pursuant to the IDEIA.  (Ps' 56.1 ¶ 27; D's Ex. 21.)  In anticipation of the CSE meeting, Plaintiffs provided the CSE with an outside neurodevelopmental evaluation, performed on June 19, 2007 by Dr. Marilyn Agin, (Ps' 56.1 ¶ 20; D's Ex. 17), and an update from CL's occupational therapist, (D's 56.1 ¶ 30; D's Ex. 19).  Dr. Agin reported that CL "has demonstrated the ability to meet academic standards in the early grades given educational supports.  He has the intellectual potential to succeed if his deficits in executive functions, . . . variable attention and focus, and language-based learning issues, [*sic*] are properly addressed in the classroom."  (D's Ex. 17 at 5.)  Dr. Agin also noted that she was "concerned about [CL's] emotional well-being and self-esteem as well as his ability to succeed academically," and recommended that his parents "investigate a private educational setting with an expertise in teaching children with attentional and learning issues for the September 2008 school year."  (*Id.*)  She ultimately recommended for CL the same services and accommodations the District offered CL—LRC four times per week, OT, SLT, and an aide in the classroom—as well as various other classroom accommodations, an after-school tutor, an auditory processing dysfunction evaluation, and omega 3 fatty acids.  (*Id.* at 5–6.)

In conjunction with the CSE review, the District also evaluated CL, administering speech, language, and educational testing and having a psychologist do an in-classroom

observation of CL.  (D's 56.1 ¶ 31.)  The speech and language evaluator reported that CL "does

not meet the eligibility criteria to receive classified speech and language services.  His testing

results were consistently in the average to significantly above average range on tasks of form,

content and usage of linguistic concepts."  (D's Ex. 28.)  On the Stanford Diagnostic Reading

Test, CL scored in the eighty-second percentile on the phonetic analysis subtest; ninety-second

percentile on the vocabulary subtest; and forty-third percentile on the comprehension subtest.

(D's 56.1 ¶ 36; D's Ex. 27.)  On the Stanford Diagnostic Math Test, CL scored in the thirty-

eighth percentile on the concepts and abilities subtest and the eighty-fourth percentile on the

computation subtest.  (D's 56.1 ¶ 37.)[11]  On the writing assessment, CL scored in the forty-fifth

percentile.  (*Id.* ¶ 38.)   During the classroom observation, CL was "following the assignment,

remained focused for the most part, and with clarification from an adult in the classroom, was

able to complete his assignment."  (*Id.* ¶ 39.)

    The CSE met on January 8, 2008 and reviewed the various evaluation results, CL's recent

report card, progress reports, and social and developmental history, and heard from CL's teacher,

Mr. O'Rourke, concerning CL's classroom performance and behavior.  (D's Ex. 25 at 2; D's

56.1 ¶¶ 40–41.)  Based on that information, the CSE determined that CL "does not have a

significant disability which would make him eligible for special education services."  (D's Ex. 25

at 2.)  The CSE also decided to reduce CL's time in the LRC from four to two days, although the

parties differ as to why the CSE took this action.  (D's 56.1 ¶ 43; Ps' Reply 56.1 ¶ 43.)

    The 504 Committee met on May 20, 2008 to formulate a plan for the next school year.

(D's 56.1 ¶ 44; D's Ex. 36.)  The Committee took note of the following information:  CL's

---

[11] Plaintiffs allege, however, that the scores on the math test were inaccurate because these scores resulted from a re-test that violated testing protocols.  (Ps' Reply 56.1 ¶ 37.)  Defendant alleges that the teacher administered the re-test because CL was uncooperative during the initial test, often filling in an answer before looking at the question.  (SRO Decision 8 n.8.)  CL's scores soared on the re-test.  (IHO Decision 11.)

teacher, Mr. O'Rourke, reported that CL "made notable strides as a learner" and "has shown improvement in all academic subject areas," but that CL's "attention continues to interfere with his performance," (D's Ex. 36 at 2); CL's LRC teacher noted that CL scored in the sixty-first percentile on the Stanford Abbreviated Comprehension Test and in the eightieth percentile on the Stanford Open-Ended Test and that his "primary issues remain attention and maturity," (*id.* at 3); and Dr. Glen Krielsheimer, a private psychologist who attended the meeting at the request of CL's parents, diagnosed CL with a non-verbal learning disability, (*id.*).  The Section 504 Committee decided that CL would continue to receive LRC twice per week, an aide in the classroom, and OT and SLT (which Plaintiffs continued to decline).  (*Id.* at 3; D's 56.1 ¶¶ 47–48.)

Plaintiffs disagreed with the District's proposed plan for the 2008–2009 school year and placed CL at Eagle Hill School ("Eagle Hill") in Greenwich, Connecticut.  (Ps' 56.1 ¶¶ 44–45.) On June 19, 2008, Plaintiffs informed the Greenacres principal by letter that CL would not be attending Greenacres for the 2008–2009 school year and instead would be attending Eagle Hill. (D's 56.1 ¶ 49.)  On June 5, 2009, Plaintiffs filed a request for an impartial hearing seeking reimbursement for the Eagle Hill tuition for the 2008–2009 school year.  (Ps' 56.1 ¶¶ 45, 57; D's Ex. 40.)

B.     Administrative Proceedings

1.     IHO Decision

The IHO held a hearing on September 24–25 and October 8–9, 2009, and in a decision dated December 21, 2009, made several findings.  First, the IHO found that the District had denied CL a FAPE when it determined that CL was not eligible for special education pursuant to an IEP for the 2008–2009 school year, and therefore had violated the IDEIA and Section 504 of

the Rehabilitation Act. (IHO Decision 28, 30.) Second, the IHO found that Plaintiffs' placement of CL at Eagle Hill was appropriate, "if not . . . ideal," because, among other things, Eagle Hill "addresses self-esteem and confidence building in addition to academic remediation, and C.L. has needs in these areas"; Eagle Hill's curriculum and accommodations are tailored to the needs of each student and progress is checked and adjustments made on a daily basis; the process through which CL applied and was admitted to Eagle Hill was "likely to result in an appropriate placement"; teachers at Eagle Hill use "instructional strategies" to address many of CL's needs, including "language issues, anxiety, self-confidence, and difficulty working independently"; CL participated in a small group tutorial class two periods per day to focus on written expression and study skills, and the rest of his classes were relatively small as well; CL had an advisor who met with him daily, observed him, and participated in staff meetings concerning CL's progress; and CL "plainly made significant progress" at Eagle Hill both personally and academically. (*Id.* at 31–33.) Finally, the IHO found no equitable reasons to limit tuition reimbursement, concluding that CL's parents had acted cooperatively and in good faith when seeking an IEP and selecting an alternative placement. (*Id.* at 33–34.)

2. SRO Decision

The District appealed the IHO's decision to the SRO. On March 10, 2010, the SRO upheld the IHO's decision that the District should have classified CL as eligible for special education services under the IDEA, although he based his decision on different grounds. (SRO Decision 17, 20.) The SRO, however, annulled the IHO's decision concerning the appropriateness of Eagle Hill as a placement for CL, finding that Eagle Hill was too restrictive and not tailored to CL's needs. More specifically, the SRO found Eagle Hill to be inappropriate because (1) CL did not "require" an environment that "provided no opportunity for the student to

9

interact with nondisabled peers"; (2) CL was successful in, and in fact benefitted from, a general education program among nondisabled peers; and (3) Eagle Hill did not offer appropriate OT services.  (SRO Decision 21–23 & n.13.)

## II.   Applicable Legal Standards

### A.   IDEIA

#### 1.   Provision of a FAPE

The IDEIA serves to promote the education of children with disabilities.  *See, e.g.*, *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998) (citing *Bd. of Educ. v. Rowley*, 458 U.S. 176, 179 (1982)).  Under the statute, states that receive federal funding must provide disabled children with a FAPE, 20 U.S.C. § 1412(a)(1), which includes "special education and related services" tailored to meet the unique needs of the particular child, *id.* § 1401(9).

"The 'centerpiece of the statute's education delivery system' is the IEP, an educational program tailored to provide appropriate educational benefits to individual disabled students." *Viola v. Arlington Cent. Sch. Dist.*, 414 F. Supp. 2d 366, 377 (S.D.N.Y. 2006) (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)).  The IEP must be developed annually by "[a] school official qualified in special education, the child's teacher, the child's parents, and, where appropriate, the child." *Walczak*, 142 F.3d at 122.  The IDEA sets forth procedural and substantive requirements for IEPs, *see* 20 U.S.C. § 1414, but "does not itself articulate any specific level of educational benefits that must be provided through an IEP," *Walczak*, 142 F.3d at 130.  Courts interpreting the IDEA make clear, however, that a school district is not required to "furnish[] . . . every special service necessary to maximize each handicapped child's potential," *Rowley*, 458 U.S. at 199 (interpreting the Education for All Handicapped Children Act, the predecessor to the IDEA),

but rather, a "district fulfills its substantive obligations under the IDEA if it provides an IEP that

is likely to produce progress, not regression, and if the IEP affords the student with an

opportunity greater than mere trivial advancement," *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d

186, 195 (2d Cir. 2005) (internal quotation marks omitted).  Thus, a school district must devise

an IEP that is "reasonably calculated to enable the child to receive educational benefits," *Davis v.*

*Wappingers Cent. Sch. Dist.*, 431 F. App'x 12, 14 (2d Cir. 2011) (summary order), but it need

not "provide[] everything that might be thought desirable by loving parents," *Walczak*, 142 F.3d

at 132 (internal quotation marks omitted).  Finally, the "services must be provided in the least

restrictive setting consistent with a child's needs."  *Id.* at 122.

New York's regulations implementing the goals of the IDEA "appear to track the IDEA

closely."  *Bd. of Educ. v. O'Shea*, 353 F. Supp. 2d 449, 454 (S.D.N.Y. 2005); *see* N.Y. Educ.

Law §§ 4401–4410-b.  Parents are entitled to challenge "any matter relating to the identification,

evaluation or educational placement of the student or the provision of a free appropriate public

education to the student."  N.Y. Educ. Law § 4404(1); *see also* 20 U.S.C. § 1415(b)(6)(A)

(same).  Such challenges must be heard at an impartial due process hearing conducted by the

state or local education agency, *see* 20 U.S.C. § 1415(f), and either party may appeal an adverse

decision to the appropriate state agency, *see id.* § 1415(g); N.Y. Educ. Law § 4404(2).  Once this

administrative process is exhausted, a party may file a civil action in federal or state court

challenging the administrative decision.  *See* 20 U.S.C. § 1415(i)(2)(A); N.Y. Educ. Law §

4404(3).

2.      Unilateral Placement in Private School

"If a state receiving IDEA funding fails to give a disabled child a FAPE[,] . . . the child's

parent may remove the child to an appropriate private school and then seek retroactive tuition

11

reimbursement from the state." *O'Shea*, 353 F. Supp. 2d at 454 (internal quotation marks omitted). "In determining whether parents are entitled to reimbursement, the Supreme Court has established a two pronged test:  (1) was the IEP proposed by the school district inappropriate; (2) was the private placement appropriate to the child's needs.  Moreover, because the authority to grant reimbursement is discretionary, equitable considerations [relating to the reasonableness of the action taken by the parents] are relevant in fashioning relief." *Frank G. v. Bd. of Educ.*, 459 F.3d 356, 363–64 (2d Cir. 2006) (alteration in original) (internal quotation marks and citations omitted).  Because neither party contests the SRO's decision that the District violated the IDEIA when it failed to classify CL as a student with a disability requiring an IEP, only the second prong is at issue in this case.

Parents bear the burden of demonstrating that a private placement is appropriate, *see id.* at 364; N.Y. Educ. Law § 4404(1)(c), even if the Defendant's program was inappropriate, *see Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007).  The parents' placement must be "reasonably calculated to enable the child to receive educational benefits," such that it is "likely to produce progress, not regression."  *Frank G.*, 459 F.3d at 364 (internal quotation marks omitted).  "Grades, test scores, and regular advancement may constitute evidence that a child is receiving educational benefit, but courts assessing the propriety of a unilateral placement consider the totality of the circumstances in determining whether that placement reasonably serves a child's individual needs."  *Id.* at 364–65.  Therefore, while "a child's progress is relevant to the court's review, such progress does not itself demonstrate that a private placement was appropriate."  *Weaver v. Millbrook Cent. Sch. Dist.*, 812 F. Supp. 2d 514, 523 (S.D.N.Y. 2011) (internal quotation marks omitted).  Furthermore, "the test for the parents' private placement is that it is appropriate, and not that it is perfect," *Warren G. ex rel. Tom G. v.*

12

*Cumberland Cnty. Sch. Dist.*, 190 F.3d 80, 84 (3d Cir. 1999), and parents "need not show that a private placement furnishes every special service necessary to maximize their child's potential." *Frank G.*, 459 F.3d at 365. Rather, parents must show that the placement "provides educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction." *Id.* (internal quotation marks omitted).

Moreover, the IDEA exhibits a "strong preference for 'mainstreaming,' or educating children with disabilities '[t]o the maximum extent appropriate' alongside their non-disabled peers." *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 379 (2d Cir. 2003) (alteration in original) (quoting 20 U.S.C. § 1412(a)(5)). While parents "may not be subject to the same mainstreaming requirements as a school board," *Frank G.*, 459 F.3d at 364, the "IDEA's requirement that an appropriate education be in the mainstream to the extent possible . . . may be considered by the hearing officer in determining whether the placement was appropriate." *Weaver*, 812 F. Supp. 2d at 524 (internal quotation marks omitted); *see Muller ex rel. Muller v. Comm. on Special Educ.*, 145 F.3d 95, 105 (2d Cir. 1998) ("presumption in favor of mainstreaming must be weighed against the importance of providing an appropriate education to handicapped students") (internal quotation marks omitted); *Adrianne D. v. Lakeland Cent. Sch. Dist.*, 686 F. Supp. 2d 361, 367 (S.D.N.Y. 2010) ("level of restrictiveness may be considered in determining whether tuition reimbursement should be ordered"); *see also Schreiber v. E. Ramapo Cent. Sch. Dist.*, 700 F. Supp. 2d 529, 549 n.10 (S.D.N.Y. 2010) (given role that mainstreaming may play in assessing the appropriateness of a private placement, Second Circuit's two-part test for determining whether a district's IEP provides least restrictive environment may also be useful in determining the appropriateness of a parental placement. The

test asks:  "(1) 'whether a student can be satisfactorily educated in the regular classroom with the benefit of supplemental aids and services;' and (2) if the school district was justified in removing the student from the mainstream classes, 'whether the school has included the child in school programs with nondisabled children to the maximum extent appropriate.'") (quoting *P. ex rel. Mr. & Mrs. P. v. Newington Bd. of Educ.*, 546 F.3d 111, 121 (2d Cir. 2008)).

### 3.   Summary Judgment Standard

Motions for summary judgment customarily resolve IDEA actions in federal court.  *See Antonaccio ex rel. Alex v. Bd. of Educ.*, 281 F. Supp. 2d 710, 714 (S.D.N.Y. 2003).  Under the IDEA, unlike in the usual case, the existence of a disputed issue of fact will not defeat the motion.  *Id.*  Rather, summary judgment "is a pragmatic procedural mechanism for reviewing administrative decisions."  *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009) (internal quotation marks omitted).  In reviewing an action pursuant to 20 U.S.C. § 1415(i) of the IDEA, the district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(C); *see Grim*, 346 F.3d at 380–81.

In deciding the motion, the court undertakes what "has been characterized as modified *de novo* review."  *C.B. ex rel. W.B. v. N.Y.C. Dep't of Educ.*, No. 02-CV-4620, 2005 WL 1388964, at *12 (E.D.N.Y. June 10, 2005) (internal quotation marks omitted).  The district court must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence, but its review of state administrative decisions is limited.  *See Rowley*, 458 U.S. at 205–06; *Walczak*, 142 F.3d at 129.  "While federal courts do not simply rubber stamp administrative decisions, they are expected to give due weight to these

proceedings, mindful that the judiciary generally lack[s] the specialized knowledge and

experience necessary to resolve persistent and difficult questions of educational policy."

*Walczak*, 142 F.3d at 129 (alteration in original) (internal quotation marks omitted).  Deference

to administrative decisions is "particularly warranted where . . . the district court's decision was

based solely on the administrative record."  *See A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165,

171 (2d Cir. 2009).  Furthermore, such deference to the final decision of state authorities is

appropriate even where the SRO disagrees with the IHO, *see R.R. ex rel. M.R. v. Scarsdale*

*Union Free Sch. Dist.*, 366 F. App'x 239, 241 (2d Cir. 2010) (summary order) (IHO's decision

may receive "diminished weight" when it conflicts with SRO's decision because courts are to

"defer to the final decision of the state authorities"); *A.C. ex rel. M.C.*, 553 F.3d at 171 (same);

*Karl by Karl v. Bd. of Educ.*, 736 F.2d 873, 877 (2d Cir. 1984) ("deference [to final decision of

state authority] may not be eschewed merely because a decision is not unanimous or the

reviewing authority disagrees with the hearing officer"), particularly where the SRO's review

was "thorough and careful," *Walczak*, 142 F.3d at 129.  Reviewing courts should also be mindful

that they are not to "substitute their own notions of sound educational policy for those of the

school authorities which they review."  *Rowley*, 458 U.S. at 206.  In order to avoid

"impermissibl[y] meddling in state educational methodology," the court should look for

objective evidence—such as grades and test results—to determine whether the child is likely to

progress or regress under the proposed plan.  *Mrs. B. ex rel. M.M. v. Milford Bd. of Educ.*, 103

F.3d 1114, 1121 (2d Cir. 1997).

B.      Rehabilitation Act of 1973

      1.      Section 504

Section 504 of the Rehabilitation Act of 1973 provides that "[n]o otherwise qualified

individual with a disability in the United States . . . shall, solely by reason of her or his disability,

be excluded from the participation in, be denied the benefits of, or be subject to discrimination

under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).  The

scope of protection under the Rehabilitation Act differs from that under the IDEA.  "The

Rehabilitation Act provides relief from discrimination, whereas [the] IDEA provides relief from

inappropriate educational placement decisions, regardless of discrimination."  *BD v. DeBuono*,

130 F. Supp. 2d 401, 438 (S.D.N.Y. 2000).  To prove a violation of the Rehabilitation Act, a

plaintiff must show that "(1) he is an individual with a disability; (2) he is otherwise qualified to

participate in a particular program; (3) he was denied that participation based upon his disability;

and (4) the program receives federal funds."  *Id.* (citing *D'Amico v. City of N.Y.*, 132 F.3d 145

(2d Cir. 1998)).  A plaintiff may assert a Section 504 claim in conjunction with an IDEA claim

on the theory that she has been "denied access to a free appropriate education, as compared to the

free appropriate education non-disabled students receive"; in so doing, however, the plaintiff

must show that "defendants acted with bad faith or gross misjudgment in the administration of

disability services."  *S.W. by J.W. v. Warren*, 528 F. Supp. 2d 282, 290 (S.D.N.Y. 2007).  As

courts have explained:

> That a court may . . . come to the conclusion that an incorrect evaluation has been
> made, and that a different placement must be required [under IDEA], is not
> necessarily the same thing as holding that a [disabled] child has been
> discriminated against solely by reason of his or her [disability].  Therefore,
> something more than a mere violation of the IDEA is necessary in order to show a
> violation of Section 504 in the context of educating children with disabilities, i.e.,

> a plaintiff must demonstrate that a school district acted with bad faith or gross misjudgment.

*Zahran ex rel. Zahran v. N.Y. Dep't of Educ.*, 306 F. Supp. 2d 204, 213 (N.D.N.Y. 2004) (alterations in original) (internal quotation marks omitted).

### 2. Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact, and, if satisfied, the burden then shifts to the non-movant to present evidence sufficient to satisfy every element of the claim. *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

17

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1)(A).  Where an affidavit is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008).  In the event a party "fails to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials— including the facts considered undisputed—show that the movant is entitled to it."  Fed. R. Civ. P. 56(e)(2), (3).

"Though caution must be exercised in granting summary judgment where intent is genuinely in issue, summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact."  *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 40 (2d Cir. 1994) (citation omitted); *see Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("[S]ummary judgment may be appropriate even in the fact-intensive context of discrimination cases. . . . [T]he salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation.") (fourth alteration in original) (internal quotation marks omitted).

18

III.    **Discussion**

    A.    IDEIA Claim

        1.    Preliminary Issues

First, because neither party has appealed the SRO's conclusion that the District failed in its duty to classify CL as requiring special education services, I need not review it. *See Stevens ex rel. E.L. v. N.Y.C. Dep't of Educ.*, No. 09-CV-5327, 2010 WL 1005165, at \*1 (S.D.N.Y. Mar. 18, 2010) (because defendant conceded it failed to offer student appropriate education, only issues for review related to tuition reimbursement).

Second, in deciding the Motions for Summary Judgment, the Court will consider the affidavit of Dr. David Salsberg, submitted by Plaintiffs as an attachment to their Memorandum of Law in Reply to Defendant's Motion for Summary Judgment ("Ps' Reply Mem."). (Doc. 20.) "Courts review[] administrative decisions under [the] IDEA . . . [by] taking into account not only the record from the administrative proceedings, but also any further evidence presented before the District Court by the parties." *G.B. ex rel. N.B. v. Tuxedo Union Free Sch. Dist.*, 751 F. Supp. 2d 552, 570 (S.D.N.Y. 2010) (quoting *Grim*, 346 F.3d at 380); *see* 20 U.S.C. § 1415(i)(2)(C)(ii) (court "shall hear additional evidence at the request of a party"). Although the "taking of additional evidence is a matter . . . left to the discretion of the trial court," "courts generally accept evidence that was not withheld in bad faith, is relevant, and does not change the administrative review into a trial de novo." *G.B. ex rel. N.B.*, 751 F. Supp. 2d at 555 n.1 (alteration in original) (internal quotation marks omitted). The affidavit of Dr. Salsberg meets these criteria (although the Court does wonder why Plaintiffs waited to submit it until the due date of their reply memorandum in opposition to Defendant's Motion for Summary Judgment). Furthermore, Defendant's concern that it did not have a sufficient opportunity to rebut the

affidavit's content is mitigated by the Defendant's submission of a Sur-Reply.  That is not to say that the Court finds the affidavit particularly influential.  Indeed, the submission at the eleventh hour of the affidavit of a doctor who examined CL on one occasion, two years after the relevant time period, has had little effect on this Court's analysis.

        2.    <u>Tuition Reimbursement</u>

The SRO and IHO disagreed about whether CL's parents should be reimbursed for the tuition paid to Eagle Hill—a disagreement that boils down to one central issue:  the degree to which CL was progressing at Greenacres versus his need for a small, special education setting.  The IHO determined that CL was "not succeeding as a student in the School District's regular education program," and that his "need for a small class, special education program with specific programs . . . to address [his] significant needs" outweighed any "benefit from interaction with nondisabled peers."  (IHO Decision 33.)  The SRO disagreed, finding that CL "made progress" during the third grade at Greenacres in a general education classroom with additional supports and services.  (SRO Decision 22.)  As such, CL "did not require a special education environment such as Eagle Hill," and in fact benefitted from "interact[ing] with his nondisabled peers."  (*Id.* at 22–23.)

I find the SRO's decision to be supported by a preponderance of the evidence and see no reason to disturb it.  First, the SRO's conclusion that CL made progress at Greenacres—evidencing his ability to succeed among nondisabled peers—is clearly supported by the testimony in the record and CL's report cards.[12]  For example, Joan Iorio, CL's LRC teacher, testified that during his third grade year, CL "continued to progress at a very nice pace.  He

---

[12] Although the SRO's decision understandably focuses on CL's progress during his third grade year, the record demonstrates that CL progressed and achieved satisfactory grades during his earlier years at Greenacres as well. (*See supra* pp. 3–5; D's Exs. 5, 9, 16.)

continued to -- his reading and his phonics, his writing, the math, and his work habits continued

to progress," and he "certainly had gained a lot of the skills he needed.  I mean absolutely he was

doing well, and the standardized test certainly showed he had those skills."  (Tr. 287:9–14,

288:4–7.)  In the spring semester of 2008, after CL's time in the LRC had been reduced from

four days to two days per week, Ms. Iorio concluded that the reduction was "appropriate.  He

continued to do nicely and at the end of the year his testing was wonderful."  (Tr. 288:20–289:2.)

Similarly, Mr. O'Rourke, CL's third grade teacher, testified that CL made "notable strides," (Tr.

458:23–24), and "steadily progressed within each subject area," (Tr. 452:16–17).

CL's third grade report card also reflects solid progress and achievement over the course

of the year.  CL was evaluated in sixty-one categories across thirteen subjects—personal and

social development, work habits, reading, writing, speaking and listening, mathematics, science,

social studies, health, Spanish, physical education, music, and art.  For most of the criteria, he

was assessed on a scale of one to four (with four being the highest).  He received no ones, and he

received a three or four ("good" or "excellent") for all but five of the sixty-one criteria.  (D's Ex.

35 at 1.)  The comments on the report card stated that CL "had a great year," made "progress,"

and "has some good friends in [the] class and . . . is a kind and considerate classmate."  (*Id.*)  On

his LRC report card, his teachers affirmed that he has "made progress in all areas of reading and

writing this year."  (D's Ex. 35 at 3.)

Plaintiffs argue, in contrast, that Eagle Hill was appropriate because it provided CL with

"peers of average intelligence with language based learning disorders and attentional issues

similar to C.L.'s."[13]  (Ps' Reply Mem. 3 (citing IHO Decision 33).)  They also assert that CL

required a small class size because he would "lose focus or attention" when the teacher was

---

[13] The students at Eagle Hill each have "some type of language based learning disability," and "approximately half . . . have also been duly diagnosed as having some form of attentional issues."  (Tr. 543:19–25.)

teaching in front of the class, "had difficulty with concepts being taught in the large group," and

often "required extra support" in a small group or one-on-one with the teacher or aide.  (Ps'

Mem. 8 (citing Tr. 428, 431, 433, 437, 473).)[14]  Notwithstanding CL's evident difficulties in the

classroom, based on the totality of the evidence in the record, I conclude that CL indeed made

meaningful progress among his peers at Greenacres—a fact that negates the argument that he

required placement among students with learning disabilities and attentional issues in order to

receive an appropriate education.  Moreover, the fact that CL made use of and benefitted from

the extra services provided to him by the District, (*see* Ps' Mem. 8), reinforces the District's

contention that CL could succeed in a general education environment when provided with extra

support.[15]

       Second, the SRO concluded that CL in fact "benefitted from interaction with his

nondisabled peers," (SRO Decision 23)—a finding that is based on ample testimony and

supported by the record.  For example, CL's third grade teacher testified that although CL often

socialized with one friend in particular (which also occurred at Eagle Hill, (*see* Ps' Ex. D at 1)),[16]

over the course of the year, CL "opened up more," became more "outgoing" and "comfortable

sharing in front of the class," "wanted to be perceived as a hard worker . . . [by] his classmates,"

and was "accepted socially and . . . feels confident."  (Tr. 435:17–437:3, 454:7–8, 472:7–9.)  To

be sure, the record reflects that CL had nontrivial anxiety and confidence issues while at

Greenacres.  (Tr. 451:16–25, 556:17–557:8, 673:10–16; D's Ex. 25.)  But the record also

---

[14] "Ps' Mem." refers to Plaintiff's [*sic*] Memorandum of Law in Support of Their Motion for Summary Judgment. (Doc. 14.)
[15] The IHO made much of the recommendation of Dr. Agin that CL's parents investigate private school options. (*See* IHO Decision 10, 31; D's Ex. 17 at 5.)  While relevant, Dr. Agin's suggestion does not speak to the appropriateness of Eagle Hill in particular, as opposed to other private schools, and therefore cannot serve as a basis for overturning the SRO's well-grounded findings.  Moreover, Dr. Agin also recommended services and accommodations that the District provided.  (D's Ex. 17 at 5–6.)
[16] "Ps' Ex." refers to Exhibits A-L submitted by Plaintiffs as part of the administrative record filed under seal.

indicates that these issues persisted throughout the 2008–2009 school year at Eagle Hill.  (*See* D's Ex. 39 at 2.)[17]  Moreover, it is not clear that Eagle Hill actually took more effective or robust steps than did Greenacres to address CL's anxiety and confidence issues.  CL never worked directly with the school psychologist at Eagle Hill; instead, a psychologist consulted with the school staff who would address CL's issues during class.  (*See* Tr. 593:22–595:6.)  Similarly, Mr. O'Rourke testified that he tried to mitigate CL's anxiety and confidence issues in class at Greenacres.  (*See* Tr. 451:16–452:10.)  Thus, given the IDEA's preference for mainstreaming to the maximum extent possible and the deference owed to the SRO's decision, *see M.S. ex rel. S.S.*, 231 F.3d at 105 (reversing district court's reversal of SRO determination that placement was not appropriate in part because it was not least restrictive environment), I cannot conclude that the SRO's judgment that CL benefitted from being in a general education setting is not supported by a preponderance of the evidence.

Third, the SRO found that Eagle Hill was not appropriate because it "did not offer an educational program which met the student's special education needs in the area of fine motor skills."  (SRO Decision 23.)[18]  Ever since CL was in kindergarten, the 504 Committee had recommended that CL receive OT.  CL initially received OT services through the District, but

---

[17] Although Plaintiff G.W. testified that CL was happier, more self-confident, and less anxious when attending Eagle Hill, (*see* Tr. 673:3–16), this evidence is not determinative given courts' preferences for "objective" evidence at this stage of review.  *See M.S. ex rel. S.S. v. Bd. of Educ.*, 231 F.3d 96, 105 (2d Cir. 2000); *Mrs. B. ex rel. M.M.*, 103 F.3d at 1120–21.

[18] Plaintiffs assert that the "SRO improperly ruled sua sponte" that Eagle Hill was not appropriate based on its lack of OT services because the District "did not make this argument during the course of the Impartial Hearing and did not raise this as an issue on appeal."  (Compl. ¶ 26.)  The party seeking review of an IHO decision must "indicate the reasons for challenging the [IHO's] decision, identifying the findings, conclusions and orders to which exceptions are taken."  N.Y. Comp. Codes R. & Regs. tit. 8, § 279.4(a).  In its petition for review of the IHO's decision, Defendant indicated its objection to the IHO's finding that "the program at Eagle Hill was tailored to meet C.L.'s needs."  (D's Pet. ¶ 61.)  I find that based on this objection, the SRO did not err in considering the lack of OT services as part of the broader inquiry into Eagle Hill's capacity to meet CL's "unique" needs.  *Gagliardo*, 489 F.3d at 115 (parental placement must provide "educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction") (internal quotation marks omitted).

during his second grade year, CL's parents opted to have these services provided privately,[19] allegedly because Greenacres did not have a sensory gym.  The SRO took note of the fact that CL did not receive OT at Eagle Hill and that Eagle Hill did not have an occupational therapist on staff—it had only a "motor training specialist" with a degree in adaptive physical education, (Tr. 595:7–18)—and ultimately concluded that the services at Eagle Hill did not meet CL's "special education needs in the area of fine motor skills."  (SRO Decision 23.)

On one hand, although CL did not receive OT at Eagle Hill, CL also declined OT through the District, a fact which arguably weakens the SRO's point about Eagle Hill's lack of OT services, particularly if, as CL's parents contend, the District was unable to provide CL with appropriate OT services.  (*See* Tr. 632:25–633:11, 637:3–6 (District lacked "sensory gym" for CL's OT needs); *but see* D's 56.1 ¶ 26 (sensory gym irrelevant because 504 Committee recommended OT for fine, not gross, motor needs).)  Moreover, a parent "need not show that a private placement furnishes every special service necessary to maximize their child's potential." *Frank G.*, 459 F.3d at 365.

On the other hand, the fact that the District could not provide certain OT services or that Plaintiffs opted not to utilize these services does not bolster the appropriateness of a private placement that lacks those services.  Under the *Burlington-Carter* test, the appropriateness of a placement is assessed *independently* of the issue of whether the District provided the student with a FAPE.  *See, e.g.*, *M.P.G. ex rel. J.P. v. N.Y.C. Dep't of Educ.*, No. 08-CV-8051, 2010 WL 3398256, at *2 (S.D.N.Y. Aug. 27, 2010).  Furthermore, the appropriateness inquiry concerns whether a placement provides "education instruction *specifically* designed to meet the *unique* needs of a handicapped child," *Gagliardo*, 489 F.3d at 115 (emphasis in original) (internal

---

[19] CL's parents did not start CL in private OT until June 2007—the end of his second grade year.  (Tr. 632:25–633:22.)

24

quotation marks omitted); *see Stevens*, 2010 WL 1005165, at *9 (finding placement inappropriate because it did not provide special services, including occupational therapy, that student needed), and as such, the SRO correctly considered whether the placement met CL's unique OT needs.  Therefore, the SRO's finding that Eagle Hill did not meet CL's specific needs because it did not provide OT services is supported by the relevant legal standards and the record.

Thus, for the reasons discussed above, I find the SRO's decision to be supported by a preponderance of the evidence.  The SRO set out a detailed, twenty-three page, single-spaced decision.  He performed a careful and thorough review of the lengthy administrative proceedings.  His determination is supported by the record and aligns with the IDEA's preference for mainstreaming students to the maximum extent possible, *see Schreiber*, 700 F. Supp. 2d at 549, and therefore should be upheld.  That is not to say that many of the IHO's findings are not also supported by the record.  The IHO's conclusions that CL was progressing at Eagle Hill and that he benefitted from the small class size, individualized teaching strategies, and tutorial periods make sense.  (*See* IHO Decision 32–33.)  Also compelling is the testimony of Eagle Hill's former Director of Admissions, Joan Griffin, which demonstrates that Eagle Hill tailors its curriculum to each student, (Tr. 551:6–21), and places children in classes with others who have similar skills, (Tr. 555:14–556:3).  While this evidence of Eagle Hill's advantages and CL's progress at Eagle Hill is relevant, however, "it does not itself demonstrate" that the placement was appropriate.  *See Gagliardo*, 489 F.3d at 115.  As the Second Circuit has cautioned:

> We finally add a word about the position a district court finds itself in where, as here, it is called upon to review a case in which parents have enrolled their disabled child in a private school, believing it to be the best thing for the child,

> and can point to their child's record of success at the school they chose.  It is understandable that a district court would be receptive to parents under these circumstances; a child's progress is relevant to the court's review.  But such progress does not itself demonstrate that a private placement was appropriate.  Indeed, even where there is evidence of success, courts should not disturb a state's denial of IDEA reimbursement where, as here, the chief benefits of the chosen school are the kind of educational and environmental advantages and amenities that might be preferred by parents of any child, disabled or not.  A unilateral private placement is only appropriate if it provides education instruction *specifically* designed to meet the *unique* needs of a handicapped child.

*Id.* (emphasis in original); *see Stevens*, 2010 WL 1005165, at *9 (finding structured environment, small class size, daily homework, and frequent communication with parents to be the types of amenities all parents would prefer); *see also Adrianne D.*, 686 F. Supp. 2d at 368 (finding "irrelevant" the fact that child achieved "greater progress" under different program, given that IDEA does not require more than "basic floor of opportunity") (internal quotation marks omitted); *id.* ("One can readily appreciate the feelings of loving parents who have themselves observed the benefits of education at [a private school].  Still, as Justice Ginsburg expressed it," because public resources are limited, federal law "'does not secure the best education money can buy; it calls upon government, more modestly, to provide an appropriate education.'") (quoting *Lunceford v. D.C. Bd. of Educ.*, 745 F.2d 1577, 1583 (D.C. Cir. 1984)).

In sum, while Eagle Hill seems to be a fine school, I cannot say—given the record of CL's progress while mainstreamed at Greenacres, the propriety of the services offered to CL despite his erroneous classification, and the deference owed the SRO—that the SRO erred in his view that the pros of Eagle Hill did not outweigh the cons of an unnecessarily restrictive environment that separated CL from his non-disabled peers.

       3.    <u>Equitable Factors</u>

Even if Plaintiffs had met their burden of demonstrating that Eagle Hill was an appropriate placement, they would still have to show that they were entitled to full or partial reimbursement as a matter of equity. *Stevens*, 2010 WL 1005165, at \*10. The SRO found that because Plaintiffs had not successfully demonstrated that Eagle Hill was an appropriate placement, he did not need to reach the issue of whether equitable considerations favored reimbursement. This Court likewise finds no reason to reach that issue. Accordingly, Defendant's Cross-Motion for Summary Judgment is granted.

    B.    <u>Section 504 of the Rehabilitation Act</u>

As stated above, to make out a claim under the Rehabilitation Act, a plaintiff must show that "(1) he is an individual with a disability; (2) he is otherwise qualified to participate in a particular program; (3) he was denied that participation based upon his disability; . . . (4) the program receives federal funds," and, in the context of IDEA claims, that the school district acted with bad faith or gross misjudgment in denying him benefits. *BD*, 130 F. Supp. 2d at 438–39. There is no dispute that CL is an individual with a disability or that he qualified for benefits under a federally-funded program. The only question is whether Defendant denied him benefits because of his disability, and in so doing, acted with bad faith or gross misjudgment. *S.W. by J.W.*, 528 F. Supp. 2d at 289.

Plaintiffs' claim fails because they have failed to put forth sufficient evidence that would raise a question of fact as to whether Defendant acted with bad faith or gross misjudgment. In their complaint, Plaintiffs generally allege that Defendant developed policies of "discriminating against disabled students based upon the severity of their disability" and "requiring actual failure in classroom performance before acknowledging that a disability impacts educational

performance." (Compl. ¶ 34.) Yet Plaintiffs have offered no evidence whatsoever of such policies and have failed to point to any other instances of discrimination that would tend to show the existence of such policies. To the contrary, the record shows that Defendant's committees appeared to act diligently and thoughtfully in their consideration of CL: they met regularly to discuss CL's needs, held meetings at the request of CL's parents, considered all additional evidence offered by CL's parents at the meetings, and tracked CL's progress in a timely and efficient manner. The fact that they made an inappropriate decision regarding an IEP for CL does not itself mean that they acted in bad faith or with gross misjudgment. *See S.W. by J.W.*, 528 F. Supp. 2d at 289 ("[S]omething more than a mere violation of the IDEA is necessary in order to show a violation of Section 504.") (internal quotation marks omitted).

Plaintiffs also appear to imply that Defendant acted in bad faith by limiting CL's speech therapy to once per week, allegedly in order to avoid creating an IEP for CL pursuant to a District policy that required IEPs when a student receives speech therapy more frequently. (Compl. ¶ 37.) In a similar vein, Plaintiffs allege that the CSE reduced CL's LRC time in January 2008 to two sessions per week due to the "District's policy of only providing LRC sessions twice per week to non-classified students." (Ps' Reply 56.1 ¶ 43.)[20] Yet Plaintiffs fail to support these allegations with any evidence that would tend to raise an inference of bad faith or gross misjudgment. Plaintiff has provided no reason to doubt the integrity of Defendant's assessment of CL's SLT needs, and in fact, the neurodevelopmental evaluation obtained privately by Plaintiffs from Dr. Agin wholly concurs with the District's recommendation of speech therapy once per week. (*See* D's Ex. 17 at 6.) Likewise, there is no evidence that Defendant's reduction of LRC from four to two times per week was done in bad faith or with

---

[20] Plaintiffs offer no explanation as to how, under such a policy, CL could have received LRC four times per week during first grade, second grade, and half of third grade without an IEP.

gross misjudgment.  Defendant contends it made this decision after hearing from CL's LRC and

classroom teachers and CL's parents that CL was "resistant to attending the LRC," that "going to

the LRC impacts [CL's] self-esteem," that CL felt "stigmatized by having to leave the classroom

to attend the LRC for four periods per week," and that a reduction to two days was appropriate

given CL's academic progress.  (D's Ex. 25 at 2; D's 56.1 ¶ 43; Tr. 638:11–22.)  Meanwhile,

Plaintiffs have not come forward with any evidence that would raise doubt as to whether

Defendant's explanation is true or whether it is actually an attempt to cover up actions taken in

bad faith or with gross misjudgment.

     Thus, at its core, Plaintiffs' Rehabilitation Act claim is simply a repackaging of their

IDEA claim—that Defendant failed to "appropriately evaluate" [21] CL and "develop an

appropriate educational plan," (Compl. ¶ 35)—as they fail to show why Defendant's evaluations

or actions, even if erroneous, were discriminatory or taken in bad faith.  *See Pinn ex rel. Steven*

*P. v. Harrison Cent. Sch. Dist.*, 473 F. Supp. 2d 477, 484 (S.D.N.Y. 2007) (dismissing

Rehabilitation Act claims because they were "merely restatements of [plaintiffs'] IDEA

claims"); *Zahran*, 306 F. Supp. 2d at 213–14 (dismissing Rehabilitation Act claim because

plaintiffs made no allegations concerning bad faith or gross misjudgment; rather, Rehabilitation

Act claims were "substantially the same" as the IDEA claim and related more to "substance or

adequacy" of the educational program).  Even if Defendant violated the IDEA by failing to

provide CL with a FAPE, without actual evidence of bad faith or gross misjudgment, this failure

simply does not translate into a violation of the Rehabilitation Act.

---

[21] Plaintiffs point to one instance where Defendant utilized potentially problematic evaluative techniques.  CL's LRC teacher, Ms. Iorio, re-administered CL's Stanford Diagnostic Mathematics Test because she did not think that he was attending to the test or that his first score was reflective of his capabilities.  (D's 56.1 ¶ 37; Tr. 279:21– 280:17.)  Whether or not Ms. Iorio's re-administration of the test was proper, there is scant evidence that Defendant relied heavily on this test score when devising an educational plan for CL.  In any event, the evidence does not suggest that Ms. Iorio's actions were taken in bad faith or with gross misjudgment.  (*See supra* note 11.)

## IV.   Conclusion

For the reasons stated above. Plaintiffs' Motion for Summary Judgment is DENIED, and Defendant's Cross-Motion for Summary Judgment is GRANTED. The Clerk of the Court is respectfully directed to terminate the pending motions. (Docs. 13, 16), enter judgment for the Defendant, and close the case.

**SO ORDERED.**

Dated:  March 21, 2012
White Plains. New York

CATHY SEIBEL, U.S.D.J.